Raul Perez (SBN 174687)
Raul.Perez@capstonelawyers.com
Robert J. Drexler, Jr. (SBN 119119)
Robert.Drexler@capstonelawyers.com
Molly A. DeSario (SBN 230763)
Molly.DeSario@capstonelawyers.com
Jonathan Lee (SBN 267146)
Jonathan.Lee @capstonelawyers.com
Capstone Law APC
1875 Century Park East, Suite 1000
Los Angeles, California 90067
Telephone:    (310) 556-4811
Facsimile:    (310) 943-0396

Attorneys for Plaintiff Ishmael Perez

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ISHMAEL PEREZ, individually, and on behalf of other members of the general public similarly situated,<br><br>        Plaintiff,<br><br>    vs.<br><br>CORE & MAIN LP, a Florida limited partnership; and DOES 1 through 10, inclusive,<br><br>        Defendants. | Case No.: 5:20-cv-01821-MCS-KK<br><br>**NOTICE OF MOTION AND MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>Date:     March 7, 2022<br>Time:    9:00 a.m.<br>Place:   Courtroom 7C |

**TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on March 7, 2022 at 9:00 a.m., or as soon thereafter as counsel may be heard, in Courtroom 7C of the above-captioned court, located at 350 W. 1st Street, 7th Floor, Los Angeles, California 90012, the Honorable Mark C. Scarsi presiding, Plaintiff Ishmael Perez will, and hereby does, move this Court for entry of an order and judgment granting final approval of the class action settlement and all agreed-upon terms therein. This Motion, unopposed by Defendant Core & Main LP, seeks final approval of: (1) the Joint Stipulation of Class Action and PAGA Settlement and Release, (2) settlement payments to Participating Class Members and the LWDA, and (3) costs/expenses to the settlement administrator, ILYM Group, Inc.

This Motion is based upon: (1) this Notice of Motion and Motion; (2) the Memorandum of Points and Authorities in Support of Motion for Final Approval of Class Action Settlement; (3) the previously filed Motion for Attorneys' Fees, Costs and Expenses, and a Class Representative Enhancement Payment; (4) the Declaration of Raul Perez; (5) the Declaration of Makenna Snow on behalf of ILYM Group, Inc., the settlement administrator; (6) the [Proposed] Order Granting Final Approval of Class Action Settlement; (7) the [Proposed] Judgment; (8) the records, pleadings, and papers filed in this action; and (9) upon such other documentary and/or oral evidence as may be presented to the Court at the hearing.

Dated: February 7, 2022                    Respectfully submitted,

By: /s/ Raul Perez
    Raul Perez
    Robert J. Drexler, Jr.
    Molly A. DeSario
    Jonathan Lee
    **CAPSTONE LAW APC**

    Attorney for Plaintiff Ishmael Perez

# TABLE OF CONTENTS

I.    INTRODUCTION ...........................................................................................1

II.   FACTS AND PROCEDURE .....................................................................3

    A.    Brief Overview of the Litigation and Settlement Negotiations ...........3

    B.    The Proposed Settlement Fully Resolves Plaintiff's Claims .............4

        1.    Composition of the Settlement Class......................................4

        2.    PAGA Members.....................................................................4

        3.    Settlement Consideration......................................................4

        4.    Formula for Calculating Payments from the Net Settlement Fund ...........5

        5.    Formula for Calculating Payments from the PAGA Fund.....................5

        6.    Release by the Settlement Class..............................................6

        7.    Release by PAGA Members ...................................................6

    C.    The Notice and Settlement Administration Processes Were Completed Pursuant to the Court's Order ...........................................................7

III.   ARGUMENT.............................................................................................8

    A.    Class Certification Requirements Are Met.........................................8

    B.    The Court Should Grant Final Approval of the Class Settlement ....................8

        1.    The Settlement Was Negotiated at Arm's Length by Experienced Counsel ...........................................................................10

        2.    The Extent of Discovery Completed Supports Final Approval...............11

        3.    The Settlement Is Within the Range of Reasonableness Considering the Strength of Plaintiff's Case and the Risk, Expense, Complexity, and Duration of Further Litigation .......................................12

        4.    The Settlement Class Has Responded Positively to the Settlement ........16

    C.    The Court Should Approve the PAGA Settlement............................17

    D.    The Requested Payment to the Settlement Administrator Is Reasonable and Should Receive Final Approval .................................................20

IV.  CONCLUSION.........................................................................................................21

MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT

# TABLE OF AUTHORITIES

**FEDERAL CASES**

*Aguirre v. Genesis Logistics*, No. SACV 12-00687 JVS (ANx), 2013 WL
10936035 (C.D. Cal. Dec. 30, 2013) ................................................................. 19

*Allen v. Bedolla*, 787 F.3d 1218 (9th Cir. 2015) .................................................... 9

*Balderas v. Massage Envy Franchising, LLP,* 2014 WL 3610945. (N.D.
Cal. July 21, 2014) ........................................................................................... 15

*Bernstein v. Virgin Am., Inc.*, 990 F.3d 1157 (9th Cir. 2021) ............................... 18

*Chambers v. Whirlpool Corp.*, 214 F. Supp. 3d 877 (C.D. Cal. 2016) ................ 8

*Chen v. Morgan Stanley Smith Barney, LLC*, No. 8:14-CV-01077 ODW
(FFMx), 2014 WL 4961182 (C.D. Cal., October 2, 2014) ............................. 18

*Chu v. Wells Fargo Invst., LLC*, No. C 05–4526 MHP, 2011 WL 672645
(N.D. Cal Feb. 16, 2011) .................................................................................. 20

*Chun-Hoon v. McKee Foods Corp.*, 716 F. Supp. 2d 848 (N.D. Cal. 2010) ................... 16

*Class Plaintiffs v. City of Seattle*, 955 F.2d 1268 (9th Cir. 1992) ....................... 8

*Cotter v. Lyft, Inc.*, 193 F. Supp. 3d 1030 (N.D. Cal. 2016) ................................ 18

*D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001) ............................... 10

*Dearaujo v. Regis Corp.*, No. 2:14-cv-01408-KJM-AC, 2016 WL 3549473
(E.D. Cal. June 29, 2016) ................................................................................. 20

*Fleming v. Covidien Inc.*, No. ED CV 10-01487 RGK (OPx) (OPX), 2011
WL 7563047 (C.D. Cal. Aug. 12, 2011) .......................................................... 18

*Garcia v. Gordon Trucking, Inc.*, No. 1:10–CV–0324 AWI SKO, 2012
WL 5364575 (E.D. Cal. Oct. 31, 2012) ........................................................... 20

*Garner v. State Farm Mut. Auto. Ins. Co.*, No. CV 08 1365 CW EMC,
2010 WL 1687832 (N.D. Cal. Apr. 22, 2010) ................................................. 16

*Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1998) .......................... 8, 9, 16

1   *Hopson v. Hanesbrands Inc.*, No. CV-08-0844 EDL, 2009 WL 928133
2       (N.D. Cal. Apr. 3, 2009)........................................................................................20
3   *In re Apple Computer, Inc. Derivative Litig.*, No. C 06-4128 JF (HRL),
4       2008 WL 4820784 (N.D. Cal. Nov. 5, 2008) .....................................................10
5   *In re Armored Car Antitrust Litig.,* 472 F. Supp. 1357 (N.D. Ga. 1979) ........................15
6   *In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935 (9th Cir. 2011) .......................10
7   *In re Extreme Networks, Inc. Sec. Litig.*, No. 15-04883, 2019 WL 3290770
8       (N.D. Cal. July 22, 2019) ........................................................................................9
9   *In re Four Seasons Secs. Laws Litig.,* 58 F.R.D. 19 (W.D. Okla.1972)...........................15
10  *In re Global Crossing Sec. and ERISA Litig.*, 225 F.R.D. 436 (S.D.N.Y.
11      2004)......................................................................................................................13
12  *In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539 (9th Cir. 2019)................................8
13  *In re IKON Office Solutions, Inc. Sec. Litig.*, 194 F.R.D. 166 (E.D. Pa.
14      2000)......................................................................................................................13
15  *In re Omnivision Tech., Inc.*, 559 F. Supp. 2d 1036 (N.D. Cal. 2008) ............................16
16  *In re Toys R Us-Delaware, Inc.-- Fair & Accurate Credit Transactions Act*
17      *(FACTA) Litig.*, 295 F.R.D. 438 (C.D. Cal. 2014) ............................................14
18  *In re Warfarin Sodium Antitrust Litig.,* 212 F.R.D. 231 (D. Del. 2002) ..........................15
19  *Kline v. Dymatize Enterprises, LLC*, 2016 WL 6026330 (S.D. Cal. Oct. 13,
20      2016).......................................................................................................................11
21  *Kline v. Dymatize Enterprises, LLC*, No. 15-CV-2348-AJB-RBB, 2016
22      WL 6026330 (S.D. Cal. Oct. 13, 2016)................................................................11
23  *Li v. A Perfect Day Franchise, Inc.*, No. 5:10-CV-01189-LHK, 2012 WL
24      2236752 (N.D. Cal. June 15, 2012) ......................................................................19
25  *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234 (9th Cir. 1998)....................................13
26  *Nat'l Rural Telecom. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523 (C.D. Cal.
27      2004)......................................................................................................................13
28  *National Rural Tele. Coop. v. DIRECTV, Inc.,* 221 F.R.D. 523 (C.D. Cal.

2004)...............................................................................................................16

*Newman v. Stein*, 464 F. 2d 689 (2d Cir. 1972)...................................................13

*Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615 (9th Cir. 1982) ...........13

*Ogbuehi v. Comcast of California/Colorado/Fla./Oregon, Inc.*, 303 F.R.D.

337 (E.D. Cal. 2014)....................................................................................10

*Rodriguez v. West Pub. Corp.*, 563 F.3d 948 (9th Cir. 2009).............................13

*Trang v. Turbine Engine Components Technologies Corp.*, No. CV 12–

07658 DDP (RZx), 2012 WL 6618854 (C.D. Cal. Dec. 19, 2012)..............18

*Vieyara-Flores v. Sika Corp.*, No. EDCV19606JVSKKX, 2019 WL

2436998 (C.D. Cal. June 10, 2019)..............................................................18

*Villegas v. J.P. Morgan Chase & Co.*, No. 09–00261, 2012 WL 5878390

(N.D. Cal. Nov.21, 2012) .............................................................................10


**STATE CASES**

*Amaral v. Cintas Corp. No. 2*, 163 Cal. App. 4th 1157 (2008)...........................18

*Carrington v. Starbucks Corp.*, 30 Cal. App. 5th 504 (2018) ...........................18

*Elder v. Schwan Food Co.*, No. B223911, 2011 WL 1797254 (Cal. Ct.

App. May 12, 2011)......................................................................................19

*Nordstrom Com. Cases*, 186 Cal. App. 4th 576  (2010).....................................20

*Thurman v. Bayshore Transit Mgmt.*, 203 Cal. App. 4th 1112 (2012)..............19


**STATE STATUTES**

Cal. Lab. Code §§ 2698 *et seq.* (Priv. Attys. Gen. Act (PAGA))........................18

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.    INTRODUCTION

On November 15, 2021, this Court granted preliminary approval of the Joint Stipulation of Class Action and PAGA Settlement and Release[1] and approved distribution of the Notice of Class Action Settlement to all Class Members. Class Members were given 45 days to opt out or object to the Settlement ("Response Deadline"). Now that the Response Deadline has passed, Plaintiff Ishmael Perez is pleased to report that: (1) no Class Members opted out; (2) no Class Members objected to the Settlement; (3) the **entire Net Settlement Amount will be disbursed to all 445 Participating Class Members**; (4) the average payment is approximately $880, and the highest is approximately $2,545. (Declaration of Makenna Snow ["Snow Decl."] ¶¶ 11-14.)

Plaintiff now moves for final approval of the class action settlement. This motion is unopposed by Defendant Core & Main LP (collectively with Plaintiff, the "Parties"). The principal terms of the Settlement provide for the following:

(1)    Conditional certification of a Settlement Class defined as: All persons employed by Defendant in the State of California in non-exempt positions at any time from June 30, 2016 through November 15, 2021 ("Class Members").

(2)    A **non-reversionary** Gross Settlement Amount of $611,875.[2] The Gross Settlement Amount includes:

---

[1] Hereinafter, the "Settlement" or "Settlement Agreement." Unless indicated otherwise, capitalized terms used herein have the same meaning as those defined by the Settlement.

[2] Because there are a total of 445 Class Members, the Gross Settlement Amount was proportionally increased to $611,875. *See* Settlement Agreement ¶ 41 ("If the number of Class Members increases by more than ten percent (10%) (i.e., increases by 36 employees to a total of 400 Class Members), then Defendant may, at its election, cut off its liability with respect to the Class Members at a total employee count of 400 or, alternatively, pay an additional amount proportionte to the settlement amount for each additional Class Member above the total employee count of 400 according to the following formula: Proportionally Increased Gross Settlement Amount = Total Number of Class Members ÷ 400 × $550,000[,]")

(a)    A Net Settlement Fund of $389,767 (the Gross Settlement Amount minus the requested Attorneys' Fees and Costs, Settlement Administration Costs, the PAGA Settlement Amount, and the Class Representative Enhancement Payment), which will be allocated to all Class Members on a pro-rata basis according to the number of weeks each Class Member worked during the Class Period. **The Entire Net Settlement Fund will be paid to all Class Members who do not opt out of the Settlement Class, and without the need to submit claims for payment.**

(b)    Attorneys' fees in the amount of one-third of the Gross Settlement Amount (or $183,333), and litigation costs and expenses of $13,775, to Capstone Law APC ("Plaintiff's Counsel").

(c)    Settlement administration costs of $10,000, to be paid to the Court-appointed Settlement Administrator, ILYM Group, Inc.

(d)    A $10,000 PAGA settlement, of which 75% ($7,500) will be paid to the Labor & Workforce Development Agency ("LWDA"), and the remaining 25% ($2,500) ("PAGA Fund"), will be payable to PAGA Members, defined as: All persons employed by Defendant in the State of California in non-exempt positions during the PAGA Period. **The Entire PAGA Fund will be paid to all PAGA Members, and without the need to submit claims for payment.**

(e)    A Class Representative Enhancement Payment of $5,000 to Ishmael Perez for his service on behalf of the Settlement Class, the risks he took in bringing the action on behalf of the class, and for a general release of all claims arising out of his employment with Defendant.

An objective evaluation of the Settlement confirms that the relief negotiated on the Settlement Class' behalf is fair, reasonable, and valuable. The Settlement was

negotiated by the Parties at arm's length with helpful guidance from the Hon. Michael D. Marcus (Ret.), an experienced and well-respected class action mediator, and the Settlement confers substantial benefits to Class Members. This relief—averaging approximately $880 per Class Member from the Net Settlement Fund—is particularly significant when it is considered that nearly half of all Class Members signed arbitration agreements. Moreover, by settling now rather than proceeding to trial, Class Members will not have to wait (possibly years) for relief, nor will they have to bear the risk of class certification being denied or of Defendant prevailing at trial, or of Plaintiff prevailing at trial but losing on appeal.

Accordingly, given the Settlement's favorable terms, the Court's previous findings concerning the Settlement's fairness and reasonableness, and the complete absence of objection to the Settlement, Plaintiff respectfully requests that the Court: (1) grant this Motion for Final Approval of the Settlement Agreement; (2) grant final approval of the settlement administration costs/expenses; (3) enter judgment pursuant to the Settlement Agreement; and (4) retain jurisdiction to enforce the Settlement.

## II.    FACTS AND PROCEDURE

### A.    Brief Overview of the Litigation and Settlement Negotiations

C&M is a Florida limited partnership with its headquarters in St. Louis, Missouri. It is a leading distributor of water, sewer, storm drain, and fire protection products in the United States. It operates at least 22 warehouse stores in California and, according to its removal papers, makes strategic decisions regarding operations management, human resources, corporate policy and compliance from its corporate headquarters in St. Louis, Missouri, for all non-exempt, hourly paid employees working for C&M in California, including Mr. Perez and class members.

Plaintiff filed his initial Complaint in the Superior Court of California for the County of San Bernardino on June 30, 2020. (Declaration of Raul Perez ["Perez Decl."] ¶ 2.) C&M subsequently removed the action on September 3, 2020. (*Id.*) On March 29, 2021, the Parties participated in full-day mediation with Judge Marcus, an experienced

1    mediator of wage and hour class actions. (*Id.*)

2         Judge Marcus helped to manage the Parties' expectations and provided a useful,

3    neutral analysis of the issues and risks to both sides, and helped to narrow the gap

4    between the Parties' respective positions. (*Id.* at ¶ 3.) With Judge Marcus's guidance, the

5    Parties were eventually able to negotiate a complete settlement of Plaintiff's claims. (*Id.*)

6    The terms of the settlement are now set forth in complete and final form in the Joint

7    Stipulation of Class Action and PAGA Settlement and Release. (*Id.*)

8         At all times, the Parties' negotiations were adversarial and non-collusive. (*Id.* at ¶

9    4.) The Settlement therefore constitutes a fair, adequate, and reasonable compromise of

10    the claims at issue. (*Id.*)

11        **B.**    **The Proposed Settlement Fully Resolves Plaintiff's Claims**

12           **1.**    **Composition of the Settlement Class**

13         The proposed Settlement Class consists of all persons employed by Defendant in

14    the State of California in non-exempt positions at any time from June 30, 2016 through

15    November 15, 2021. (Settlement Agreement ¶ 5.)

16           **2.**    **PAGA Members**

17         The $10,000 PAGA settlement will be distributed to the LWDA and all PAGA

18    Members, defined as: All persons employed by Defendant in the State of California in

19    non-exempt positions during the PAGA Period. (Settlement Agreement ¶ 17.)

20           **3.**    **Settlement Consideration**

21         Plaintiff and Defendant have agreed to settle the underlying class claims in

22    exchange for the Gross Settlement Amount of $611,875. The Gross Settlement Amount

23    includes: (1) automatic payments to all Participating Class Members from the Net

24    Settlement Fund; (2) $183,333 in attorneys' fees (i.e., one-third of the common fund)

25    and $13,775 in litigation costs to Plaintiff's Counsel; (3) Settlement Administration

26    Costs of $10,000; (4) a $7,500 payment to the LWDA and a $2,500 payment to PAGA

27    Members; and (5) a Class Representative Enhancement Payment of $5,000 for

28    Plaintiff's service on behalf of the Settlement Class, the risks he took in bringing his

representative claims, and for a release of all claims arising out of his employment with Defendant. (Settlement Agreement ¶¶ 32-36.)

Subject to the Court approving Attorneys' Fees and Costs, Settlement Administration Costs, the PAGA Settlement Amount, and the Class Representative Enhancement Payment, the Net Settlement Fund will be distributed to Participating Class Members in full. (Settlement Agreement ¶ 38.)

### 4. Formula for Calculating Payments from the Net Settlement Fund

Defendant calculated the total number of Workweeks worked by each Class Member during the Class Period and the aggregate total number of Workweeks worked by all Class Members during the Class Period. To determine each Participating Class Member's share of the Net Settlement Fund, the Settlement Administrator will use the following formula:

- The Net Settlement Fund will be divided by the aggregate total number of Workweeks, resulting in the "Workweek Value."
- Each Participating Class Member's "Individual Settlement Payment" will be calculated by multiplying each individual Participating Class Member's total number of Workweeks by the Workweek Value.
- The Individual Settlement Payment will be reduced by any required deductions for each Participating Class Member as specifically set forth herein, including employee-side tax withholdings or deductions.
- The entire Net Settlement Fund will be disbursed to all Participating Class Members.

(Settlement Agreement ¶ 40(a).)

### 5. Formula for Calculating Payments from the PAGA Fund

Defendant calculated the total number of Workweeks worked by each PAGA Member during the PAGA Period and the aggregate total number of Workweeks worked by all PAGA Members during the PAGA Period. To determine each PAGA

Member's share of the PAGA Fund, the Settlement Administrator will use the following formula:

- The PAGA Fund will be divided by the aggregate total number of Workweeks, resulting in the "PAGA Workweek Value."
- Each PAGA Member's "Individual Settlement Payment" will be calculated by multiplying each individual PAGA Member's total number of Workweeks by the PAGA Workweek Value.
- The entire PAGA Fund will be disbursed to all PAGA Members.

(Settlement Agreement ¶ 40(b).)

### 6. Release by the Settlement Class

In exchange for the Gross Settlement Amount, Plaintiff and Participating Class Members will agree to release the Released Class Claims during the Class Period:

> All claims, rights, demands, liabilities, and causes of action accruing during the Class Period that were or could have been pleaded based on the factual allegations set forth in the operative Complaint, including: (i) all claims for unpaid overtime; (ii) all claims for meal and rest break violations; (iii) all claims for unpaid minimum wages; (iv) all claims for the failure to timely pay wages upon termination based on the preceding claims; (v) all claims for the failure to timely pay wages during employment; (vi) all claims for the failure to reimburse for necessary business expenses; (vii) all claims for wage statement violations; and (viii) all claims asserted through California Business & Professions Code §§ 17200, et seq., based on the preceding claims.

(Settlement Agreement ¶¶ 24, 52.)

### 7. Release by PAGA Members

In exchange for the PAGA Settlement Amount, Plaintiff and PAGA Members will agree to release the Released PAGA Claims during the PAGA Period:

> All claims, rights, demands, liabilities, and causes of action for PAGA civil penalties accruing during the PAGA Period that were or could have been pleaded based on the factual allegations set forth in the operative Complaint and any PAGA Letters submitted to the LWDA by Plaintiff, including: (i) all claims for unpaid overtime; (ii) all claims for meal and rest break violations; (iii) all claims for unpaid minimum wages; (iv) all claims for the failure to timely pay wages upon termination based on the preceding claims; (v) all claims for the failure to timely pay wages during employment; (vi) all claims for the failure to reimburse for necessary business expenses; and (vii) all claims for wage statement violations.

(Settlement Agreement ¶¶ 25, 53.)

### C. The Notice and Settlement Administration Processes Were Completed Pursuant to the Court's Order

As authorized by the Court's Order preliminarily approving the Settlement Agreement, the Parties engaged ILYM to provide settlement administration services. (Snow Decl. ¶ 3.) ILYM's duties have, and if the Court enters the final approval order, will include: (1) printing and mailing the Notice of Class Action Settlement ("Notice"); (2) receiving and processing undeliverable Notices and locating updated addresses for Class Members; (3) calculating and distributing the Gross Settlement Amount; (4) tax reporting; (5) providing necessary reports and declarations; and (6) performing such other tasks as set forth in the Settlement Agreement or as the Parties mutually agree or that the Court orders. (*Id.*)

On November 15, 2021, ILYM received the Class Notice prepared jointly by Plaintiff's Counsel and counsel for Defendant and approved by the Court. (Snow Decl. ¶ 4.) The Class Notice summarized the Settlement's principal terms, provided Class Members with an estimate of how much they would be paid if the Settlement received final approval, and advised Class Members about how to opt out of the Settlement and how to object. (*Id.*)

Separately, counsel for Defendant provided ILYM with a mailing list (the "Class List"), which included each Class Member's full name, last known address, Social Security Numbers, and information necessary to calculate payments. (Snow Decl. ¶ 5.) The mailing addresses contained in the Class List were processed and updated using the National Change of Address Database maintained by the U.S. Postal Service. (*Id.* at ¶ 6.) On December 10, 2021, ILYM mailed Class Notices to Class Members via First-Class U.S. mail. (*Id.* at ¶ 7.) Class Members were given 45 days to opt out or object to the Settlement. Plaintiff is pleased to report that no Class Members opted out or objected to the Settlement. (*Id.* at ¶¶ 11-12.)

1  **III.    ARGUMENT**

2      **A.    Class Certification Requirements Are Met**

3       The Court certified the Class for settlement purposes upon Preliminary Approval,

4  finding that requirements under Rule 23(a) and Rule 23(b)(2) were satisfied. (*See* Dkt.

5  No. 34.) Nothing has changed that would affect the Court's ruling on class certification.

6  *See Chambers v. Whirlpool Corp.*, 214 F. Supp. 3d 877 (C.D. Cal. 2016) (reconfirming

7  the certification set forth in the preliminary approval order "[b]ecause the circumstances

8  have not changed" since that order); *In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d

9  539, 556 (9th Cir. 2019) (en banc) (courts must apply the criteria for class certification

10  "differently in litigation classes and settlement classes"). Therefore, the Court should

11  grant final certification of the Settlement Class.

12      **B.    The Court Should Grant Final Approval of the Class Settlement**

13       Upon final approval, the Court's duty is to determine whether the proposed

14  Settlement is "fundamentally fair, adequate, and reasonable." *Hanlon v. Chrysler Corp.*,

15  150 F.3d 1011, 1026 (9th Cir. 1998). In evaluating the Settlement, the Court is guided by

16  several important policies. First, federal courts favor settlements, particularly in class

17  actions, where the costs, delays and risks of continued litigation might otherwise

18  overwhelm any potential benefit the class could hope to obtain. *See Class Plaintiffs v.*

19  *City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992) (noting the "strong policy that favors

20  settlements, particularly where complex class action litigation is concerned"). Second,

21  for settlements reached through arms'-length negotiations, courts are to give:

22       [P]roper deference to the private consensual decision of the parties. . . .
23       [T]he court's intrusion upon what is otherwise a private consensual
         agreement negotiated between the parties to a lawsuit must be limited to
24       the extent necessary to reach a reasoned judgment that the agreement is
         not the product of fraud or overreaching by, or collusion between, the
         negotiating parties, and that the settlement, taken as a whole, is fair,
25       reasonable and adequate to all concerned.

26  *Hanlon*, 150 F.3d at 1027.

27       Guided by these policies, the district court then may consider some or all of the

28  following factors in evaluating the reasonableness of a settlement: (1) the strength of the

plaintiff's case and the risk, expense, complexity, and likely duration of further litigation; (2) the risk of maintaining class action status throughout trial; (3) the amount offered in settlement; (4) the extent of discovery completed and the stage of proceedings; (5) the participation of a governmental participant; (6) the experience and views of counsel; and (7) the reaction of class members. *See Hanlon*, 150 F.3d at 1026 ("*Hanlon* factors").

The amendments to Rule 23 direct the Court to consider a similar list of factors, including whether: (A) the class representatives and class counsel have adequately represented the class; (B) the proposal was negotiated at arm's length; (C) the relief provided for the class is adequate, taking into account: (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3); and (D) the proposal treats class members equitably relative to each other. FED. R. CIV. P. 23(e)(2). The Advisory Committee's notes clarify that this list of factors does not "displace" the *Hanlon* factors, "but instead aim to focus the court and attorneys on 'the core concerns of procedure and substance that should guide the decision whether to approve the proposal.'" *In re Extreme Networks, Inc. Sec. Litig.*, No. 15-04883, 2019 WL 3290770, at *6 (N.D. Cal. July 22, 2019) (quoting FED. R. CIV. P. 23(e)(2) advisory committee's note to 2018 amendment).

Additionally, for class action settlements prior to contested certification, the Ninth Circuit further requires that the Court scrutinize the settlement even more closely, applying the so-called *Bluetooth* factors.[3] *See Allen v. Bedolla*, 787 F.3d 1218, 1224 (9th Cir. 2015). As set forth below, the Settlement satisfies all of these factors, meriting final approval.

---

[3] *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 938 (9th Cir. 2011).

1
2

**1.     The Settlement Was Negotiated at Arm's Length by Experienced Counsel**

3       The Settlement is the result of the Parties' extensive settlement negotiations

4    throughout the litigation and through formal mediation. As explained above, the Parties

5    participated in a mediation with the Hon. Michael D. Marcus (Ret.), an experienced

6    mediator of wage and hour class actions. Judge Marcus helped manage the Parties'

7    expectations and provided a useful, neutral analysis of the issues and risks to both sides.

8    *See In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935, 948 (9th Cir. 2011) (the

9    presence of a neutral mediator is a factor weighing in favor of finding of no collusion);

10   *In re Apple Computer, Inc. Derivative Litig.*, No. C 06-4128 JF (HRL), 2008 WL

11   4820784, at *3 (N.D. Cal. Nov. 5, 2008) (mediator's participation weighs considerably

12   against any inference of a collusive settlement); *D'Amato v. Deutsche Bank*, 236 F.3d

13   78, 85 (2d Cir. 2001) (a "mediator's involvement in pre-certification settlement

14   negotiations helps to ensure that the proceedings were free of collusion and undue

15   pressure."); *Villegas v. J.P. Morgan Chase & Co.*, No. 09–00261, 2012 WL 5878390, at

16   *6 (N.D. Cal. Nov. 21, 2012) (participation in mediation "tends to support the

17   conclusion that the settlement process was not collusive"); *Ogbuehi v. Comcast of

18   California/Colorado/Fla./Oregon, Inc.*, 303 F.R.D. 337, 350 (E.D. Cal. 2014) (accord).

19   At all times, the Parties' negotiations were adversarial and non-collusive. (Perez Decl. ¶

20   _.)

21       The Parties were represented by experienced class action counsel throughout the

22   negotiations resulting in this Settlement. Plaintiff is represented by Capstone Law APC.

23   Plaintiff's Counsel employ seasoned class action attorneys who regularly litigate wage

24   and hour claims through certification and on the merits, and have considerable

25   experience settling wage and hour class actions. (Perez Decl. ¶¶ 24-32, Ex. 1.)

26   Defendant is represented by Littler Mendelson P.C., a respected defense firm.

27       In summary, there can be no dispute that the Settlement was negotiated at arm's

28   length and in good faith. *See In re Bluetooth Headset*, 654 F.3d at 948 (the "presence of

a neutral mediator [is] a factor weighing in favor of a finding of non-collusiveness”);
*Kline v. Dymatize Enterprises, LLC*, No. 15-CV-2348-AJB-RBB, 2016 WL 6026330, at
*5 (S.D. Cal. Oct. 13, 2016) (“That the settlement was reached with the assistance of an
experienced mediator further suggest that the settlement is fair and reasonable.”).

### 2.     The Extent of Discovery Completed Supports Final Approval

Plaintiff’s Counsel conducted a thorough investigation into the factual and legal
issues implicated by Plaintiff’s claims, and were able to objectively assess the
settlement’s reasonableness. For example, prior to filing the action, Plaintiff contacted
Plaintiff’s Counsel to discuss the factual bases for pursuing an action against Defendant
for Labor Code violations. Plaintiff was intimately familiar with Defendant’s labor
policies and practices, and over the course of multiple interviews, knowledgeably
summarized those policies and practices to Plaintiff’s Counsel. During those
conversations, he explained how the policies and practices were instituted and provided
valuable insight into how they gave rise to the alleged Labor Code violations. Based on
these interviews with Plaintiff, Plaintiff’s Counsel determined that there were legally
sufficient grounds for pursuing an action against Defendant. (Perez Decl. ¶ 5.)

Plaintiff’s Counsel also prepared a detailed letter (15 pages, single-spaced) to
notify the LWDA of Plaintiff’s intent to seek civil penalties and other available relief
recoverable under PAGA for Labor Code violations.  Significant research and effort
were expended to prepare a PAGA notice that was consistent with the developing legal
requirements so as to withstand any challenge from Defendant regarding the notice’s
sufficiency.  (Perez Decl. ¶ 6.)

Following the filing of the Complaint, and in response to Plaintiff’s discovery
requests, Plaintiff’s Counsel received a considerable amount of documents and data,
including employee demographic data, a 30% sample of Class Members’ electronic time
and payroll records, and over 400 pages of Defendant’s labor policies and procedures
manuals which covered a broad range of topics including, *inter alia*, employee clock-in
policies and procedures, attendance policies, meal periods/rest periods, overtime &

premium pay, etc. The document and data exchanges allowed Plaintiff's Counsel to fully assess the nature and magnitude of the claims being settled, as well as the impediments to recovery, and ultimately enabled Plaintiff's Counsel so as to make an independent assessment of the reasonableness of the settlement's terms. (Perez Decl. ¶ 7.)

In summary, Plaintiff's Counsel performed a thorough investigation into the claims at issue, which included:  (1) determining Plaintiff's suitability as a private attorney general and class representative through interviews, background investigations, and analyses of his employment files and related records; (2) evaluating all of Plaintiff's potential representative claims; (3) researching similar wage and hour class actions as to the claims brought, the nature of the positions, and the type of employer; (4) analyzing a sample of employees' time  and wage records; (5) reviewing Defendant's employment policies and practices; (6) researching settlements in similar cases; (7) evaluating Plaintiff's claims and estimating Defendant's liability for purposes of settlement; (8) drafting the mediation brief; and (9) participating in the mediation. (Perez Decl. ¶ 8.)

By engaging in such a thorough investigation and evaluation of Plaintiff's claims, Plaintiff's Counsel can opine that the Settlement, for the consideration and on the terms set forth in the Settlement Agreement, is fair, reasonable, an adequate, and is in the best interests of Class Members in light of all known facts and circumstances, including the risk of significant delay and uncertainty associated with litigation, and various defenses asserted by Defendant. (Perez Decl. ¶ 9.)

### 3. The Settlement Is Within the Range of Reasonableness Considering the Strength of Plaintiff's Case and the Risk, Expense, Complexity, and Duration of Further Litigation

As discussed in detail below, an objective evaluation of the Settlement confirms that the relief negotiated on the Class' behalf—a $611,875 non-reversionary total Gross Settlement Amount—is fair, reasonable, and valuable. The Settlement was negotiated by the Parties at arm's length with helpful guidance from Judge Marcus, and the Settlement confers substantial benefits to Class Members. The relief offered by the Settlement is

particularly significant when viewed against the difficulties encountered by plaintiffs pursuing wage and hour cases.

In determining whether a settlement agreement is fair, adequate, and reasonable to all concerned, the Court may consider the strength of the plaintiff's case and the amount offered in settlement, among other factors. *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1242 (9th Cir. 1998). Ultimately, "the district court's determination is nothing more than an amalgam of delicate balancing, gross approximations, and rough justice," and there is no single "formula" to be applied; rather, the Court may presume that the parties' counsel and the mediator arrived at a reasonable range of settlement by considering Plaintiff's likelihood of recovery. *Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 625 (9th Cir. 1982); *Rodriguez v. West Pub. Corp.*, 563 F.3d 948, 965 (9th Cir. 2009).

Federal district courts recognize that there is an inherent "range of reasonableness" in determining whether to approve a settlement "which recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion." *Newman v. Stein*, 464 F. 2d 689, 693 (2d Cir. 1972); *see also Nat'l Rural Telecomm. Coop. v. Directv, Inc.*, 221 F.R.D. 523, 527 (C.D. Cal. 2004) ("well settled law that a proposed settlement may be acceptable even though it amounts to only a fraction of the potential recovery").[4]

| Defendant's Maximum Potential Exposure for the Class Claims | |
|---|---|
| Rest Period Claim[5] | $3,209,900.00 |
| Meal Period Claim[6] | $385,190.00 |

---

[4] *See also In re Global Crossing Sec. and ERISA Litig.*, 225 F.R.D. 436, 460 (S.D.N.Y. 2004) ("settlement amount's ratio to the maximum potential recovery need not be the sole, or even dominant, consideration when assessing settlement's fairness"); *In re IKON Office Solutions, Inc. Sec. Litig.*, 194 F.R.D. 166, 184 (E.D. Pa. 2000) ("the fact that a proposed settlement constitutes a relatively small percentage of the most optimistic estimate does not, in itself, weigh against the settlement; rather the percentage should be considered in light of strength of the claims").

[5] 140,600 rest period-eligible shifts during the Class Period × $22.83 average hourly wage = $3,209,898.

[6] 140,600 meal period-eligible shifts × 12% violation rate (15% violation rate reduced to 12% to account for payment of meal premiums paid) × $22.83 average

| Defendant's Maximum Potential Exposure for the Class Claims | |
| --- | --- |
| Minimum Wage / Off-the-Clock[7] | $371,630.00 |
| Regular Rate[8] | $1,560.00 |
| Business Expense Reimbursement Claim[9] | $47,425.00 |
| Wage Statement Claim[10] | $759,550.00 |
| Final Pay Claim[11] | $570,525.00 |
| Total | **$5,345,780.00** |

This estimate assumes that each and every one of Plaintiff's claims would have been certified for class-wide resolution, that Plaintiff's would have prevailed at trial, and that the jury's verdict would have been affirmed on appeal. Understandably, for purposes of evaluating the settlement's reasonable, this estimate must be "tempered by factors such as the risk of losing at trial, the expense of litigating the case, and the expected delay in recovery (often measured in years)." *In re Toys R Us-Delaware, Inc.-- Fair & Accurate Credit Transactions Act (FACTA) Litig.*, 295 F.R.D. 438, 453 (C.D. Cal. 2014).

Ultimately, Plaintiff's Counsel determined an appropriate range of recovery for settlement purposes by offsetting Defendant's maximum theoretical liability by: (i) the strength of the defenses to the merits of Plaintiff's claims; (ii) the risk of class

---

hourly wage = $385,190.

[7] 16,278 hours of uncompensated time (i.e., conservatively estimating 0.5 hours of off-the-clock work per workweek, between the effects of Defendants' time shaving, and work while clocked out for meal periods, plus 2 hours of off-the-clock work per employee for off-the-clock drug tests) × $22.83 average hourly wage = $371,630.

[8] 156 occasions of regular rate violations (i.e., based on the expert analysis, estimating 2 occasions for 20% of the employees) and conservatively estimating a $10 average underpayment of overtime wages or meal period premium for failure to incorporate non-discretionary bonus payments into the regular rate of pay, on each occasion.

[9] $7.75 average expenses per month (i.e., prorated for $3 per month in debit card fees for 50% of employees, plus $5 per month in cell phone expenses for all employees, plus $50 average unreimbursed expenses for tools and protective equipment per employee, plus $35 in unreimbursed mileage expenses per employee for drug tests) × approximately 24,475 workweeks in the three-year expense reimbursement claim period (assuming 4 workweeks per month, at $7.75 average per month).

[10] 313 class members in the wage statement claims period × $50 for each initial violation + 7,439 remaining pay periods × $100 for each subsequent violation = $759,550 in section 226(e) penalties.

[11] 119 terminations × 7-hour average shift length (conservative estimate) × $22.83 average hourly wage × 30 days for waiting-time penalties = $570,522.

certification being denied; (iii) the risk of losing on any of a number of dispositive motions that could have been brought between certification and trial (e.g., motions to decertify the class, motions for summary judgment, and/or motions in limine) that might have eliminated all or some of Plaintiff's claims, or barred evidence/testimony in support of the claims; (iv) the risk of losing at trial; (v) the chances of a favorable verdict being reversed on appeal; and (vi) the difficulties attendant to collecting on a judgment (collectively, the "Discount Factors").

After taking into account the Discount Factors, Plaintiff's Counsel determined that it would be reasonable to settle for a fraction of Defendant's maximum potential exposure for the class claims (PAGA discussed in the following section), or approximately 10%, which is essentially the product of the probability of: (i) certification being granted on **all claims** ($\approx$ 50%); (ii) prevailing on summary judgment/motions in limine/renewed motions to deny certification on **all claims** ($\approx$ 50%); (iii) prevailing at trial on **all of Plaintiff's claims** ($\approx$ 40%); i.e., 50% $\times$ 50% $\times$ 40%.

Such a discount is inherently reasonable given that Plaintiff would have had to overcome **multiple, dependent** contingencies to prevail on his claims. If anything, the projected odds for each of the above contingencies is generous to the class' position, since plaintiffs in employment cases rarely prevail on **all of the claims** at any of these dispositive stages. Courts routinely approve settlements that provide a similar discounted range of the maximum potential recovery. *See, e.g., In re Warfarin Sodium Antitrust Litig.,* 212 F.R.D. 231, 256-58 (D. Del. 2002) (recognizing that a reasonable settlement amount can be 1.6% to 14% of the total estimated damages); *In re Armored Car Antitrust Litig.,* 472 F. Supp. 1357, 1373 (N.D. Ga. 1979) (settlements with a value of 1% to 8% of the estimated total damages were approved); *In re Four Seasons Secs. Laws Litig.,* 58 F.R.D. 19, 37 (W.D. Okla.1972) (approving 8% of damages); *Balderas v. Massage Envy Franchising, LLP,* 2014 WL 3610945, at *5 (N.D. Cal. July 21, 2014) (finding that settlement which amounted to 8% of maximum recovery "[fell] within the

1  range of possible initial approval based on the strength of plaintiff's case and the risk and

2  expense of continued litigation."); *In re Omnivision Techs., Inc.,* 559 F. Supp. 2d 1036,

3  1042 (N.D. Cal. 2008) (approving settlement of 6% to 8% of estimated damages).

4              **4.      The Settlement Class Has Responded Positively to the**

5                       **Settlement**

6              In evaluating the fairness of a Settlement, the "absence of a large number of

7  objections to a proposed class action settlement raises a strong presumption that the

8  terms of a proposed class settlement action are favorable to the class members." *National*

9  *Rural Tele. Coop. v. DIRECTV, Inc.,* 221 F.R.D. 523, 529 (C.D. Cal. 2004). Here, no

10 Class Members opted out or objected to the Settlement. (Snow Decl. ¶¶ 11-12.) The

11 Class's response is "overwhelmingly positive," supporting approval of the Settlement.

12 *See 7-Eleven Owners for Fair Franchising*, 85 Cal. App. 4th at 1152-53 (finding support

13 for the settlement where 80 out of 5,454 class members elected to opt out and nine class

14 members objected); *Chun-Hoon v. McKee Foods Corp.*, 716 F. Supp. 2d 848, 852 (N.D.

15 Cal. 2010) (finding 0 objections and 16 opt-outs out of 329 class members [4.86%]

16 "strongly support[] settlement"); *Garner v. State Farm Mut. Auto. Ins. Co.*, No. CV 08

17 1365 CW EMC, 2010 WL 1687832, at *15 (N.D. Cal. Apr. 22, 2010) (finding an opt-

18 out rate of 0.4% supported settlement). In other words, "[t]he fact that the overwhelming

19 majority of the class willingly approved the offer and stayed in the class presents at least

20 some objective positive commentary as to its fairness." *Hanlon v. Chrysler Corp.*, 150

21 F.3d 1011, 1027 (9th Cir. 1998).

22            The average settlement payment is approximately $880 and the highest is

23 approximately $2,545. (Snow Decl. ¶ 14.) This average net recovery is significantly

24 higher than many wage and hour class action settlements approved by California state

25 and federal courts. *See*, *e.g.*, *Badami v. Grassroots Campaigns, Inc.*, Case No. C 07-

26 03465 JSW (N.D. Cal. Sept. 15, 2008) (average net recovery of approximately $195);

27 *Sandoval v. Nissho of Cal., Inc.*, Case No. 37-2009-00091861 (San Diego County Super.

28 Ct.) (average net recovery of approximately $145); *Fukuchi v. Pizza Hut*, Case No.

BC302589 (L.A. County Super. Ct.) (average net recovery of approximately $120); *Contreras v. United Food Group, LLC*, Case No. BC389253 (L.A. County Super. Ct.) (average net recovery of approximately $120); *Ressler v. Federated Department Stores, Inc.*, Case No. BC335018 (L.A. County Super. Ct.) (average net recovery of approximately $90); *Doty v. Costco Wholesale Corp.*, Case No. CV05-3241 FMC-JWJx (C.D. Cal. May 14, 2007) (average net recovery of approximately $65); *Sorenson v. PetSmart, Inc.*, Case No. 2:06-CV-02674-JAM-DAD (E.D. Cal.) (average net recovery of approximately $60); *Lim v. Victoria's Secret Stores, Inc.*, Case No. 04CC00213 (Orange County Super. Ct.) (average net recovery of approximately $35); and *Gomez v. Amadeus Salon, Inc.*, Case No. BC392297 (L.A. Super. Ct.) (average net recovery of approximately $20).

### C.    The Court Should Approve the PAGA Settlement

Pursuant to the Settlement Agreement, $10,000 from the Gross Settlement Amount shall be allocated to the resolution of the PAGA claim, of which 75% ($7,500) will be paid directly to the LWDA, and the remaining 25% ($2,500) will be paid to PAGA Members.  (Settlement Agreement ¶ 36.)

This result was reached after good-faith negotiation between the parties. The amount was valued as follows:  Based on information and evidence produced by Defendant during discovery, Plaintiff's Counsel determined that aggrieved employees worked a combined total of approximately 7,760 pay periods during the PAGA statute of limitations period ("PAGA Period"). Statutory penalties would be calculated according to Labor Code 2699(f)(2): If, at the time of the alleged violation, the person employs one or more employees, the civil penalty is one hundred dollars ($100) for each aggrieved employee per pay period for the initial violation and two hundred dollars ($200) for each aggrieved employee per pay period for each subsequent violation.

However, a number of courts have found that the "subsequent" penalty under PAGA applies only after a <u>court</u> or the <u>Labor Commissioner</u> determines that the employer has violated the Labor Code. *See Bernstein v. Virgin Am., Inc*., 990 F.3d 1157,

1173 (9th Cir. 2021) (reversing judgment as to "heightened civil penalties" because the defendant was not given notice by the Labor Commissioner when the "subsequent" violations occurred); *Vieyara-Flores v. Sika Corp.*, No. EDCV19606JVSKKX, 2019 WL 2436998, at *5 (C.D. Cal. June 10, 2019) ("employers are not subject to heightened penalties . . . until a court or commissioner notifies the employer that it is in violation of the Labor Code . . . [Plaintiff] has not offered evidence that the Labor Commission or a court has notified them of PAGA violations [thus] PAGA's heightened penalty of $200 for subsequent violations will not be calculated to determine the amount in controversy"); *Chen v. Morgan Stanley Smith Barney, LLC*, No. 8:14-CV-01077 ODW (FFMx), 2014 WL 4961182 (C.D. Cal., October 2, 2014) ("Under the Labor Code, if an employer does not have notice that they are committing a violation, they are not subject to the heightened penalties."); *Trang v. Turbine Engine Components Technologies Corp.*, No. CV 12–07658 DDP (RZx), 2012 WL 6618854 (C.D. Cal. Dec. 19, 2012) ("courts have held that employers are not subject to heightened penalties for subsequent violations unless and until a court or commissioner notifies the employer that it is in violation of the Labor Code"), citing *Amaral v. Cintas Corp. No. 2*, 163 Cal. App. 4th 1157 (2008). Under this line of cases, Defendant's exposure would be approximately $776,000 = 7,760 violative pay periods × $100.

It should be noted that PAGA gives the Court wide latitude to reduce the amount of civil penalties "based on the facts and circumstances of a particular case" when "to do otherwise would result in an award that is unjust, arbitrary and oppressive, or confiscatory." Cal. Lab. Code § 2699(h). In reducing PAGA penalties, courts have considered issues including whether the employees suffered actual injury from the violations, whether the defendant was aware of the violations, and the employer's willingness to fix the violation. *Carrington v. Starbucks Corp.*, 30 Cal. App. 5th 504, 528 (2018) (awarding PAGA penalties of only 0.2% of the maximum); *see also Cotter v. Lyft, Inc.*, 193 F. Supp. 3d 1030, 1037 (N.D. Cal. 2016); *Fleming v. Covidien Inc.*, No. ED CV 10-01487 RGK (OPX), 2011 WL 7563047, at *4 (C.D. Cal. Aug. 12, 2011).

For example, during the penalty phase of trial in *Carrington*, the plaintiff requested PAGA penalties in the amount of approximately $70 million. The trial court instead awarded only $150,000—**or 0.21% of the maximum**—and stated that this reduction was warranted because imposing the maximum penalty would be "unjust, arbitrary, and oppressive" based on Starbucks's "good faith attempts" to comply with meal period obligations and because the court found the violations were minimal. *Carrington*, 30 Cal. App. 5th at 517. The Court of Appeal affirmed the lower court's reduced award of a $150,000 penalty under PAGA. *Id.* at 529. If a similar reduction had been applied here, Plaintiff would have recovered only approximately $1,630 ($776,000 × 0.0021 reduction).

Likewise, in *Covidien*, the Court reduced the potential penalties by over 82%, awarding $500,000 instead of maximum penalties of $2.8 million. *Covidien*, 2011 WL 7563047 at *4; *see also Thurman v. Bayshore Transit Mgmt.*, 203 Cal. App. 4th 1112, 1135-36 (2012) (affirming 30% reduction under specified PAGA claim where the employer produced evidence that it took its obligations seriously); *Elder v. Schwan Food Co.*, No. B223911, 2011 WL 1797254, at *5-*7 (Cal. Ct. App. May 12, 2011) (reversing trial court decision denying any civil penalties where violations had been proven, remanding for the trial court to exercise discretion to reduce, but not wholly deny, civil penalties); *Li v. A Perfect Day Franchise, Inc.*, No. 5:10-CV-01189-LHK, 2012 WL 2236752, at *17 (N.D. Cal. June 15, 2012) (denying PAGA penalties for violation of California Labor Code section 226 as redundant with recovery on a class basis pursuant to California Labor Code section 226, directly); *Aguirre v. Genesis Logistics*, No. SACV 12-00687 JVS (ANx), 2013 WL 10936035 at *2-*3 (C.D. Cal. Dec. 30, 2013) (reducing penalty for past PAGA violations from $1.8 million to $500,000, after rejecting numerous other PAGA claims).

Plaintiff therefore determined an appropriate range of settlement for PAGA penalties as a percentage of the settlement range that was consistent with other hybrid

class/PAGA settlements approved by California courts.[12] Where PAGA penalties are negotiated in good faith and "there is no indication that [the] amount was the result of self-interest at the expense of other Class Members," such amounts are generally considered reasonable. *Hopson v. Hanesbrands Inc.*, No. CV-08-0844 EDL, 2009 WL 928133, at *9 (N.D. Cal. Apr. 3, 2009); *see, e.g., Nordstrom Com. Cases*, 186 Cal. App. 4th 576, 579 (2010) ("[T]rial court did not abuse its discretion in approving a settlement which does not allocate any damages to the PAGA claims.").

### D. The Requested Payment to the Settlement Administrator Is Reasonable and Should Receive Final Approval

Plaintiff requests final approval of settlement administration costs in the amount of $10,000. (Snow Decl. ¶ 15.) ILYM has promptly and properly distributed the Class Notice to all Class Members and completed its duties in accordance with the settlement terms and the Court's preliminary approval Order. (*See generally* Snow Decl.) Accordingly, the $10,000 payment is fair and reasonable and should be accorded final approval along with the rest of the Settlement terms.

---

[12] *Dearaujo v. Regis Corp.*, No. 2:14-cv-01408-KJM-AC, 2016 WL 3549473 at *3 (E.D. Cal. June 29, 2016) (preliminarily approving $1.95 million settlement containing $10,000 PAGA penalties with $7,500 paid to LWDA); *Garcia v. Gordon Trucking, Inc.*, No. 1:10–CV–0324 AWI SKO, 2012 WL 5364575 at *7 (E.D. Cal. Oct. 31, 2012) (approving $3.7 million settlement containing $10,000 PAGA penalties with $7,500 paid to LWDA); *Chu v. Wells Fargo Invst., LLC*, No. C 05–4526 MHP, 2011 WL 672645 at *1 (N.D. Cal Feb. 16, 2011) (approving $6.9 million settlement containing $10,000 PAGA penalties with $7,500 paid to LWDA); *Guerrero v. R.R. Donnelley & Sons Co.*, Case No. RIC 10005196 (Riverside County Super. Ct. July 16, 2013; Judge Matthew C. Perantoni) (gross settlement fund of $1,100,000, of which $3,000 (or 0.3%) was allocated to the settlement of PAGA penalties); *Parra v. Aero Port Services, Inc.*, No. BC483451 (L.A. County Super. Ct. April 20, 2015; Judge Jane Johnson) (gross settlement fund of approximately $1,458,900, of which $5,000 (or 0.3%) was allocated to the settlement of PAGA penalties); *Thompson v. Smart & Final, Inc.*, No. BC497198 (L.A. County Super. Ct. Nov. 18, 2014; Judge William F. Highberger) (gross settlement fund of $3,095,000, of which approximately $13,333 (or 0.4%) was allocated to the settlement of PAGA penalties); *Chavez v. Vallarta Food Enterprises, Inc.*, No. BC490630 (L.A. County Super. Ct. Nov. 10, 2014; Judge William F. Highberger) (gross settlement fund of $1,545,900, of which $10,000 (or 0.6%) was allocated to the settlement of PAGA penalties); *Coleman v. Estes Express Lines, Inc.*, No. BC429042 (L.A. County Super. Ct. Oct. 3, 2013; Judge Kenneth R. Freeman) (gross settlement fund of $1,535,000, of which $1,000 (or 0.1%) was allocated to the settlement of PAGA penalties).

1

## IV.    CONCLUSION

2           The Parties have negotiated a fair Settlement of the wage and hour claims that

3   likely would not have been brought, let alone successfully resolved, but for the effort and

4   resolve of the Plaintiff and his counsel. The Class Members' positive response indicates

5   that the Settlement is fair and reasonable. Accordingly, Plaintiff respectfully requests that

6   this Court grant final approval of the Settlement Agreement and enter judgment.

7

8

9   Dated: February 7, 2022                    Respectfully submitted,

10

                                      By:  /s/ Raul Perez
11                                         Raul Perez
                                           Robert J. Drexler, Jr.
12                                         Molly A. DeSario
                                           Jonathan Lee
13                                         **CAPSTONE LAW APC**

14                                         Attorney for Plaintiff Ishmael Perez

15

16

17

18

19

20

21

22

23

24

25

26

27

28